UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| Edward Teems | ) |
| | ) |
| Plaintiff, | ) Case No:  2:08-cv-00782-HDM-RJJ |
| | ) |
| vs. | ) **PLAINTIFFS REPLY TO DEFENDANTS'** |
| | ) **RESPONSE TO MOTION FOR PARTIAL** |
| Edgewater Gaming, LLC, d/b/a | ) **SUMMARY JUDGMENT DETERMINING THAT** |
| Edgewater Hotel & Casino, *et al* | ) **DEFENDANTS HAD NO AUTHORITY TO** |
| | ) **DEMAND THAT PLAINTIFF LEAVE THE** |
| Defendants. | ) **PREMISES** |
| _____ | ) |

## I.  RELEVANCE OF THE PRESENT ISSUE

Defendants assert that there's no relevance to the issues in this motion, and determination unnecessary.  Except for saying that plaintiff never sued for being denied access, the defendants do not address the claimed lack of relevance.  *See* Defendants' Brief, pp. 1-2.  Defendants miss the point.  The issue before the court needs to be determined relative to plaintiff's claims for false imprisonment, malicious prosecution, and violation of 42 U.S.C. § 1983.

Exhibits 1-3 to the motion are the reports of the defendants relative to the detention of plaintiff.  In relevant part, these party admissions provide:

1. Defendant Collins:  **Teems was being trespassed per management** request.  . . . Teems started to walk out of the area, as Marshall and I attempted to stop Teems he shoved Marshall.

2. Defendant Marshall:  Myself and s/o Collins made contact with . . . Teems to **advise him he was being trespassed and evicted** per request of management.

3. Edgewater Incident Report:   Deynes said management wanted to have **two males trespassed** . . . As we were near Teems he turned towards me.  I was now standing directly in front of teems.  Marshall, who was to the left of Teems stepped to his right **so we were both now directly in front of Teems**. . . . [1]  As Marshall asked Teems

---

[1] Note:  While plaintiff is stopped with two of Edgewater's security standing in front of him and demanding identification, Edgewater acknowledges that the plaintiff had no duty to provide identification.  Original Motion, Answers to Interrogatories, ¶ 15.

a fourth time for his identification Teems left shoulder bumped Marshall.  Marshall then instructed me to handcuff Teems.

(Emphasis added).  Evident in the foregoing is that plaintiff was stopped and detained by Edgewater personnel in direct relation to Edgewater seeking to eject plaintiff from the premises.  Also of import is the detention occurs because the defendants are seeking to compel Teems to produce identification attendant to their attempt to trespass him.  In an interrogatory, Edgewater, Edgewater admits the contact between its employees and plaintiff occurred because, "Defendant was attempting to issue the trespass warning to Teems . . .".  Motion, Exhibit 4, ¶ 8, *accord* ¶19.[2]  It is the defendants' assertion of a right to eject Teems that gives rise to this case, and if there is no right, then defendants could not chase Teems down in their casino and stop (detain) him, and instead, defendant's actions pursued a legally inappropriate goal.

False imprisonment turns on whether the legal authority to detain.  Nev. Rev. Stat. 200.460 ("False imprisonment . . . consists in . . . detention without sufficient legal authority.").  If the court determines that a casino does not have the legal authority to eject a member of the public absent a legitimate reason, then the actions taken by the defendants in the ejection of the plaintiff were without legal authority.  This includes detention of the plaintiff to trespass him.  This includes the arrest of the plaintiff for refusing to provide identification attendant to the defendants' ejection.  Jury instructions concerning the right to eject the plaintiff will be determined.  At least four party admissions of the incident would be found to state that the defendants subjected plaintiff to legally unwarranted demands that were the "but for" and "proximate" cause of the entire circumstance.  Clearly, this issue is relevant.

---

[2] *See also* Original Motion, Exhibit 4, ¶ 3, where Edgewater refuses to provide an answer on the basis that, "Defendant has the right to refuse patronage for any reason or no reason at all."

## II.  REPLY TO DEFENDANTS' OBJECTION TO PLAINTIFF'S STATEMENT OF FACTS

Defendant claims that the "handwritten statement by Susan Ihnon, a Senior Executive Host with the Edgewater Hotel and Casino," is inadmissible because it is not supported by a foundational affidavit.  The foundational affidavit of counsel citing the subpoena is attached to the original motion.  Now defendants' acknowledgment of the author and source renders the statements made admissible as party admissions.  As to Defendants' contention that Ms. Ihnon's definition of an advantage player is unknown, this is untrue.  "Advantage Player" is a term of art in the gaming industry.  *See* "*Advantage Play for the Casino Executive*," Bill Zender (Zender, 2006)[3], "*The Blackjack Zone*," Elliot Jacobson, Ph.D. (Blue Point Books 2005) ("**Glossary Advantage Player.**  A player who enters a casino knowing how to play one or more games with an edge over the house.").  Words are to be given the meaning of their common understanding in an industry.  *Accord Sunray DX Oil Co. v. Helmerich & Payne, Inc.*, 398 F.2d 447, 450 (10th Cir. 1968).  "Advantage Player" means what it says.  To come before this court and argue that a casino executive doesn't know the meaning of a term she used is disingenuous in the extreme.

Lastly, defendants claim some disability to plaintiff's contention because plaintiff has not "submitted any affidavit stating the cause of, or his opinion why his admission to defendant's premises was restricted."  Plaintiff submitted the party admission, and the defendant relies upon the claim that they don't need a reason.  Original Motion, Exhibit 4, ¶ 3.  Even now, defendants argue they are allowed to keep the reason secret.  But it's too late.  They told the Gaming Control Board why plaintiff was ejected through Ms. Ihnon (plaintiff was winning too much), plaintiff

Edgewater itself has placed the very issue before the court in the motion at issue in this litigation, and now claims it is irrelevant.

discovered the communication, and that communication presents the admissible reason unless

plaintiff refutes it through contrary evidence.

### III.  DEFENDANTS' REFERENCE TO A GAMING SALON AND GAMING SALON ISSUES DO NOT APPLY TO THIS CASE

Defendants spend pages arguing that the plaintiffs' remedies are administrative only

under Nev. Rev. Stat. 463.4076 addressing a "gaming salon."  Defendants' Brief, pp. 4-6.

Defendants err in assuming that Edgewater is a "gaming salon," when there is no "gaming salon"

involved in this case at any level and defendants' arguments are inapplicable.  A "gaming salon"

is not Edgewater, and has no relation whatsoever to this dispute.  A gaming salon is **"an enclosed

gaming facility . . . , admission to which facility is based upon the financial criteria of a patron as

established by the licensee and approved by the Board."  Nev. Rev. Stat. 463.01595.  It is a

special creation.   In 2001 passage of Nev. Senate Bill 283, allowed regulators to craft rules

enabling casinos to open "gaming salons."  Patrons in these salons are required to have

$500,000, and the minimum bet in the salons was $500.[4]  *See* <http://www.Reviewjournal.

com/lvrj_home/2003/Jul-29-Tue-2003/business/ 21828634.html>, viewed 6/22/2008.

Incidentally, the concept appears to have flopped.  *Id.*

Edgewater is a gaming establishment under Nev. Rev. Stat. 463.0129.1(e), where access

to the general public must not be denied.  Except for the inapplicable special exception for

---

[3]Mr. Zender is an industry expert and has been recognized as such in this circuit.  *See  United States v. Hung Quoc Ly*, 1998 U.S. App. LEXIS 6060, *6-*12 (9th Cir. 1998).  (Plaintiff does not cite *Hung Quoc Ly*, as precedent, but as evidence supporting Mr. Zender's status).

[4] Originally these enclaves of private gaming were called "international gaming salons."  In 2005, the legislature amended the authorizing statutes to merely refer to them as "gaming salons," deleting the term international.  *See* Nevada Senate Bill No. 266–Committee on Judiciary, Chapter 208, pp. 1169-70.

"gaming salons" set forth in Nev. Rev. Stat. 463.4076, the Nevada Gaming Control Board's jurisdiction does not reach casino/patron disputes.  Nev. Rev. Stat. 463.361 and 463.362.1(a).  Defendants' argument of Board jurisdiction is no argument whatsoever.

### IV.  THE PROVISIONS OF NEV. REV. STAT. 463.0129 TWICE INVALIDATE ANY APPLICATION OF NEV. REV. STAT. 207.200 TO A GAMING LICENSEE

As is clear from its language, Nev. Rev. Stat. 463.0129.1(e) mandates that a casino remain open to the public and that the public have access to the games.  This express direction specific to a gaming licensee inarguably conflicts with defendants' proffered status of the law, to wit:  They can put anyone out of their casino for no reason whatsoever whenever they wish.  Thus, the statute's express provisions invalidate application of Nev. Rev. Stat. 207.200.

Nev. Rev. Stat. 463.0129.3 admittedly provides an exception to the requirement of access that casinos provide access by authorizing casinos to put out anyone in accord with the common law.  By creating an exception to access to the general public (stating that ejection or exclusion under the common law survives), by negative implication the statute invalidates a "statutory" right to exclude or eject.  If the right to exclude were unlimited, then Nev. Rev. Stat. 463.0129.3 either 1) Need not exist, or 2) Need not use the words "common law" in any sense.

Claiming that the statute would prohibit or restrict exclusion of persons deserving exclusion, defendants also allude that Nev. Rev. Stat. 463.0129.1 could not mean that the casino is actually required to admit member of the general public.  But that is not the case.  The statute provides the exception of the right to exclude members of the general public under the common law.  As shown below, the drunk, the disorderly, the person who is not on the premises for the purposes of partaking of the public amusement, and persons who violate the reasonable rules, regulations and restrictions of the casino can still be ejected or excluded under the common law.

Only illegitimate/arbitrary exclusions are objectionable under the common law.  Defendants'

argument in this respect assumes far too much and is raised as a red herring.

## A.  PLAINTIFF DOES NOT ADMIT THAT NEV. REV. STAT. 207.200 PROVIDES A BASIS TO EXCLUDE THE PLAINTIFF

Contrary to defendants' statement and title in their brief at page 7, plaintiff does not

admit that Nev. Rev. Stat. 207.200 provides a basis to exclude the plaintiff from Edgewater's

premises.  In fact, the statement by the defendants borders on the frivolous considering the fact

that the motion before the court centers on the argument that no basis is supplied by the statute.

Admittedly, had the statute existed in a vacuum and the Nevada statutes remained static, a basis

may have been found within its terms, but the law changed.

Defendants' reliance on *Scott v. Justice's Court of Tahoe Township*, 84 Nev. 9, 435 P.2d

747 (1968) is in error.  Determinative in this respect is the fact that the provision in Nev. Rev.

Stat. 463.0129.1(e), commanding access by the general public did not exist in 1968.  In fact, the

provision was added in 1991 by 1991 Nev. AB 770, and the issue presented in this motion only

existed after that point in time.  Defendants other authority, *Lyons v. State*, 105 Nev. 317, 321,

777 P.2d 219, 222 (1989), and *Spilotro v. State*, 99 Nev. 187, 661 P.2d 467 (1983), suffer this

same disability. *See* Defendants' Brief, pp. 19-20.  Simply, because the requirement of access by

the general public only existed from 1991 forward, cases predating the requirement provide no

guidance on the interplay between Nev. Rev. Stat. §§ 463.0129.1(e) and 207.200.  The court's

decisions in *Spilotro*, *Lyons*, and *Scott* do not affect a question that did not arise until years later.

Moreover, *Scott*  restated the common law rule (denied to exist by defendants) that

exclusion or ejection from public amusements needs a legitimate reason.  *Scott v. Justice's Court

of Tahoe Township*, 84 Nev. 9, 12, 435 P.2d 747, 749 (1968) ("[A] revocation of the general

invitation would seem necessary before one could be considered a trespasser. Cases have held

that **such an invitation may be revoked for good cause** and the violator prosecuted."

(Emphasis added)).  By clear implication court recognized that without "good cause," the license of the patron to remain upon the property cannot be revoked.  This was the case even while Nev. Rev. Stat. 207.200 was extant and before the codification of the rule in Nev. Rev. Stat. 463.0129.1 (e).  Defendants' authority, if authority at all, supports plaintiff's position.

## B.  THE "GENERAL PUBLIC" DOES INCLUDE INDIVIDUALS

Plaintiff is a member of the "general public" stated in Nev. Rev. Stat. 463.0129.1.  The phrase 'open to the general public' means all persons who are not otherwise disabled from access by reasonable rules and regulations.  *Emory University v. Nash*, 127 S.E.2d 798, 802 (Ga. 1962) (J. Head concurring).  Truly, "open to the general public" means freely accessible to all members of the public using or intending to use the property in accord with its purpose.  As stated in *In re Lundgren*, 189 Cal. App. 3d 381, 234 Cal. Rptr. 110, 236 Cal. Rptr. 307, 312 (Cal. App. 1987):[5]

> Persons using property to which the public is allowed access may . . . be guilty of trespassing if they use the property in a manner not reasonably related to the purpose for which the owner holds it open . . . . The operative concept here . . . is the purpose for which the property has been opened to the public. Property owners are not free to define their purposes in such a way as to arbitrarily discriminate against members of the public because those persons happen to be manifesting some disagreement with the property owner.

*See also Souders v. Lucero*, 196 F.3d 1040, 1045 (9th Cir. 1999) (Access for the "general public" includes an individual's access subject to such "tranquility as the facilities' central purpose requires" subject to reasonable regulations on the conduct of the person).  Plaintiff was a member of the general public as specified in Nev. Rev. Stat. 463.0129.1, and his access to the premises offered by Edgewater must remain open.  Thus, Edgewater could not deny plaintiff access.

---

[5] *Lungren* is reported in reports as indicated, and appears a valid and binding decision between the parties thereto.  It does not, however, appear in the official reports of the State of California. *See In re Lundgren*, 1987 Cal. LEXIS 325 (Cal. 1987).

From a different perspective, the affect of Nev. Rev. Stat. 463.0129.1 is to place a gaming licensee on the same footing as a classic innkeeper, smith, or purveyor of a public amusement.  That is, Edgewater has a duty to accept all legitimate customers, i.e., the general public.  *See State v. Brown*, 195 A.2d 379, 381 (Del. 1963), *accord  Romer v. Evans*, 517 U.S. 620, 627 116 S. Ct. 1620, 1625 (1996) ("At common law, innkeepers, smiths, and others who 'made profession of a public employment,' were prohibited from refusing, without good reason, to serve a customer." ).  This duty owed to the general public, in its breach, provides a cause of action to the individual denied access.  *See Doty v. Strong*, 1 Pin. 313, 327 (Wis. 1843).  In fact, at common law the breach of such a general duty owed to the public at large with respect to an individual constitutes an indictable criminal offense.   *State v. Moore*, 12 N.H. 42, 45 (N.H. 1841) ("[A]n indictment at common law lies against an innkeeper if he refuses to receive a guest."), *see also*, HOTELS, MOTELS, ETC., 40A Am. Jur. 2d § 76.  If an individual can sue for the breach and enforce a right of access owed to the general public, *a fortiori* the entity holding the duty to refrain from excluding or ejecting the general public cannot exclude or eject an individual that fits within the class.

The analysis in the above cases is also not impeached by the defendants' authority. Plaintiff does not contend that the general public would include a religious sect that sought access to protest defendants' very activities on defendants' premises, a person in the "Black Book" that is statutorily excluded from gaming facilities, or the drunk and disorderly, the smelly, and the loud and obnoxious.  Courts do not have a difficult time with the concept of "general public," although defendants seem to.  If the person is entering or remaining on the premises for the very purpose the premises are to remain accessible to the general public, and there is no offensive character distinguishing the person from the general public, then the person is a

member of the protected class, and per Nev. Rev. Stat. 463.0129.1, Edgewater "**must remain open . . . and the access . . . to gaming activities must not be restricted in any manner** . . .".

Lastly, in this respect, the fact that defendants' argument could be presented in any case of exclusion for any reason demonstrates the fallaciousness of the position.  Per defendants, the results in *Bell v. Maryland*, 378 U.S. 226, 299 (U.S. 1964), would have been different because the exclusion of the black plaintiff was not the exclusion of the black race.  Here Nev. Rev. Stat. 463.0129.1(e) declares discrimination against a class of persons (the general public) illegal.  To apply defendants' position would emasculate the rule of access because every person excluded is excluded as an individual.  Absent a legitimate reason the defendant had no legal authority to exclude plaintiff or others similarly situated.

## C.  DEFENDANTS' ATTEMPT TO IMPEACH THE RULE OF STATUTORY CONSTRUCTION PROVIDING *EXPRESSIO UNIUS EST EXCLUSIO ALTERIOUS* FAILS ENTIRELY

Plaintiff cites a rule of statutory construction expressly adopted as applicable in Nevada, to wit: *Expressio unius est exclusio alterious*.  Defendants claim that this accepted rule within Nevada should not apply because a professor stated in some thirty-three year old book that the rule is a crock.  Defendants' Brief, p. 14: 13-21.  Crock or not, it is the rule in Nevada.  *Ex parte Arascada*, 44 Nev. 30, 35, 189 P. 619 (1920).  It is the rule in the United States Supreme Court.  *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001).  It appears to be the universal rule in the United States.  *Expressio unius est exclusio alterious* is a rule of decision in Nevada.

This highlights the error in defendants' analysis.  Obviously Nev. Rev. Stat. 463.0129.3 numerically follows Nev. Rev. Stat. 463.0129.1, and both are within the same statute.  Simply, and clearly in context, Nev. Rev. Stat. 463.0129.3 creates two specific statutory exceptions to the rule that members of the general public may not be excluded.  In fact, if the statute did not

prohibit ejection or exclusion in some cases, there would be no reason to enumerate exceptions found in Nev. Rev. Stat. 463.0129.3 or to state the rule in Nev. Rev. Stat. 463.0129.1(e).  In short, Nev. Rev. Stat. 463.0129 means what it says:  Edgewater, the casino, and access to its games must remain open to the general public, and members of the general public can only be excluded from games by wager limitations and from the premises as allowed under the common law or other exceptions specific to casinos (e.g., Nevada's Black Book).  Plaintiff does not fit within this rule.  Edgewater was legally required to not eject or exclude plaintiff.

**D.  THE CONSTRUCTION AND APPLICATION OF NEV. REV. STAT. 463.0129 IS IN ACCORD WITH THE PLAINTIFF'S POSITION**

**1. HARMONIZATION BETWEEN NEV. REV. STAT. 207.200 AND NEV. REV. STAT. 463.0129(e) ESTABLISHES DEFENDANTS' INABILITY TO LEGALLY EJECT A PATRON**

It is inescapable that Nev. Rev. Stat. 463.0129.1(e) presents a statute of prohibition on casinos.  Defendants, nevertheless, maintains Nev. Rev. Stat. 463.0129.3 presents a positive grant of authority to exclude, rather than a limited exception to the restriction at Nev. Rev. Stat. 463.0129(e).  Its language states that the common law survives.  As noted in the motion brief, the legislature can no more make common law than the executive can judge or the courts can arrest—it is court made law.  When Nev. Rev. Stat. 463.0129.3 speaks to the common law right to exclude for any reason, the legislature could not, by definition, be expanding the common law.  Therefore, the 'any reason' language can only refer to 'any reason' allowed under the common law, or as the common law relates, 'any [legitimate] reason' or 'any [non-arbitrary] reason.'

Defendants are, in fact, correct, and Nev. Rev. Stat. 463.0129.1 and Nev. Rev. Stat. 207.200 can be harmonized, but harmony between the two statutes is not as the defendants state. Instead, it requires that Nev. Rev. Stat. 207.200 not apply when it addresses a gaming patron.  In fact, Nev. Rev. Stat. 207.200 has already been harmonized with competing rights of access, and

the harmonization takes the form of barring use of Nev. Rev. Stat. 207.200 when another right of access exists.  For example, the court can look to Nev. Rev. Stat. 651.070 limiting a proprietor's exclusion of persons on the basis of race.  This statute, like Nev. Rev. Stat. 463.0129.1(e), was passed while Nev. Rev. Stat. 207.200 was already extant.  Imagine a business owner stating that he could exclude people of African dissent under Nev. Rev. Stat. 207.200 without running afoul of Nev. Rev. Stat. 651.070.[6]  It is not possible.  But that is the defendants' argument applied to the broader class of the general public.

Other persons with access obviously could not run afoul of Nev. Rev. Stat. 207.200 on a refusal to leave at request of the owner.  Examples include, a tenant, a person with a license coupled with an interest, or a person holding a *profit au'pendre*.  This was recognized by the legislature when they passed Nev. Rev. Stat. 651.020 giving hoteliers the right to eject a patron on specific terms.  Pointedly, if the innkeeper could eject even for no reason under Nev. Rev. Stat. 207.200, then there is no reason for a statute spelling out when ejection can occur, and the legislature necessarily recognized that Nev. Rev. Stat. 207.200 did not reach hoteliers.  Thus, the intent and harmonization means that Nev. Rev. Stat. 207.200 reaches only property owners seeking to exclude a person that did not have a competing and recognized right of access to the property.  This being said, Nev. Rev. Stat. 207.200 already has a harmonized construction.

Truly, the law that the legislature recognizes and that harmonization requires is that there is an implied recognition within Nev. Rev. Stat. 207.200 that the owner or occupant's warning is only effective if they have the legal right to give that warning.  A business has no legal right to

---

[6] Another construction of this statute actually grants the general public access to all public accommodations, and the race and religion language is merely explanatory.  California adopts such a construction of a similar statute, and forecloses arbitrary exclusion of members of the general public under this similar statute.  If Nevada would place the same construction on Nev.

warn a black person that they are not welcome because they are black.  This is foreclosed by Nev. Rev. Stat. 651.070.  An innkeeper has no right to eject a guest because they have a better paying guest waiting.  This is foreclosed by the common law and the negative implication in Nev. Rev. Stat. 651.020.  And a gaming establishment has no right to bar access or eject a patron for no reason or for an illegitimate reason.  This is foreclosed by Nev. Rev. Stat. 463.0129.1(e).

**2. HISTORICALLY, CURRENTLY, AND AS IT WOULD BE APPLIED IN NEVADA, THE COMMON LAW MANDATES THAT A PUBLIC AMUSEMENT CANNOT ARBITRARILY EJECT A PATRON PARTAKING OF THE AMUSEMENTS OFFERED**

Defendants' reliance on the citation to *Wood v. Leadbitter*, 13 M&W 838, 153 Eng. Rep. 351 (Ex. 1845), is misplaced.  The court in *Uston v. Resorts Int'l Hotel, Inc.*, 445 A.2d 370 (N.J. 1982), did not accept *Leadbitter* as the common law.  Rather, the holding in *Uston* was that early New Jersey decisions construing *Leadbitter* as stating the common law erred. *Uston* rejected the premise and held that *Leadbitter* did not constitute the common law.

And the *Uston* court was correct, the construction placed on *Leadbitter* in some jurisdictions errs, and *Leadbitter* does not provide a common law rule allowing exclusion for any or no reason.  The *Uston* court approached its rejection of *Leadbitter* by demonstrating that there was a split of authority concerning the nature of the common law, and changing its application in New Jersey to an historic perspective mandating access.  However, the *Uston* court could have equally reasoned that *Leadbitter* did not truly address the issue.

Pointedly, the English courts, as of 1865 (Nevada's entry into the Union) were divided into three equal jurisdictions, to wit:  1)The law courts; 2) The courts of chancery/equity; and 3) The ecclesiastical courts.  The common law is comprised from decisions in equity as well as law. *See e.g. Price v. Hitaffer*, 165 A. 470 (Md. 1933) (Referring to equitable maxims as part of the common law), *Dutill v. Dana*, 113 A.2d 499, 502 (Me. 1952) (Same), *Rankin v. Stewart*, 5 La.

---

Rev. Stat. 651.070, then another basis exists foreclosing the defendants' right to eject plaintiff.

Ann. 357 (1850) (Same), *accord Metropolitan Life Ins. Co. v. Kelley*, 890 F. Supp. 746, 748

(N.D. Ill. 1995).  Thus, *Leadbitter* only answered the question half way—solely from the

perspective of the law courts, and not the English chancery courts.  This left open the issue of

whether the common law would prevent arbitrary exclusion from public amusements in equity.

England's law courts lacked equitable jurisdiction until passage of the Supreme Court of

Judicature Act of 1873.  From that point the English law courts were able to give effect to

equitable doctrines.  *Hurst v. Picture Theatres Ltd.*, 83 LJKB 1837, All E.R. Rep. 836, 111 LT

972 (1914), presented the same questions as *Leadbitter*.  In *Hurst*, however, the court noted that

it was no longer bound by the strictures of its structure as a law court, and under equity

*Leadbitter* got it wrong.  *Hurst* held that under equity applying the common law the public

amusement did not have the right to eject the plaintiff absent plaintiff behaving improperly.  The

inability to eject a patron was found in the always co-extensive bastion of the common law

known as equity.  Thus, had the plaintiff in *Leadbitter* brought his action in chancery instead of

before the King's Bench, per the reasoning in *Hurst*, the public amusement would have been

foreclosed, under the common law in 1845, from ejecting the patron without good reason.

In this sense, the common law forwarded by plaintiff with the support of numerous

authorities clearly provides that public amusements such as the Edgewater could only exclude or

eject patrons for a legitimate reason.  *Hurst*, *supra*.  This body of authority includes a case

providing an on point rule (*Donnell v. State*, 48 Miss. 661, 680-681, 1873 Miss. LEXIS 89, **30

(1873)), a case that is even on point with the facts (*Uston v. Resorts International Hotel, Inc.*,

445 A.2d 370, 375 (N.J. 1982)), and the other cases recognizing the common law as preventing

the ejection for any or no reason (*Commonwealth v. Power*, 48 Mass. 596, 1844 Mass. LEXIS 48

*See In re Cox*, 474 P.2d 992 (Cal. 1970).

(1844), *Grannan v. Westchester Racing Ass'n*, 16 A.D. 8, 20 (N.Y. App. Div. 1897),[7] and *State v. Tauvar*, 461 A.2d 1065 (Me. 1983)).  *And see Bell v. Maryland*, 378 U.S. 226, 299 (U.S. 1964) (In concurrence, Justices Warren, Goldberg, and Douglas noting the common law's protection of a right of access and prohibition on ejection in places of public amusement.).

Other authorities also state the rule.  *See Ferguson v. Gies*, 46 N.W. 718, 720 (Mich. 1890) (Common law of access for white men--restaurant), *Cummins v. St. Louis Amusement Co.*, 147 S.W.2d 190 (Mo. App. 1941) (Cannot eject "without any good reason" from a public amusement—theater), *Willis v. McMahan*, 26 P. 649 (Cal. 1891).[8]  That's nine decisions from nine jurisdictions recognizing the common law as not allowing exclusion from a public amusement absent a legitimate reason.  This contrasts sharply with defendants' authority of two cases from one jurisdiction and a third relying on these two.  Defendants' Brief, p. 17.

Of special note is *Ferguson v. Gies*, 46 N.W. 718, 720 (Mich. 1890) where the court noted, "The **common law** as it existed in this State before the passage of this [early civil rights] statute, and before the colored man became a citizen under our Constitution and laws, gave to the white man a remedy against any unjust discrimination to the citizen in all public places." (Discussing a restaurant).  This comment sheds a harsh light on the reality highlighted by the *Uston* decision.  The common law indeed protected, and in Nevada having never been modified, still protects the 'white man'(s)' access to public places.  To hold that the civil rights acts, 14th Amendment and Nev. Rev. Stat. 651.070, destroyed the white man's common law access, rather

_____

[7]Recognizing common law rule, but reversed at 47 N.E. 896 (N.Y.1897) with the court finding that the exclusion of the person was based on reasonable grounds).

[8]In *Willis*, although the defendant was a hotel, the inducement and service sought by the plaintiff was the healing waters of proximate springs operated by the proprietors and to which the plaintiff was arbitrarily denied access.  In affirming a judgment for a plaintiff being denied admission without legitimate reason, the court twice noted that it was the "entertainment" offered, and which was denied the plaintiff, that supported the action and the claim, and no mention was made of any special duty of an hotelier or innkeeper.  In this sense, the case fully

than extended the law to protect the access of the non-white person, constitutes the bare and despicable adoption of a rule found and constructed solely for the purpose of discrimination. Despite the legislature having done so with Nev. Rev. Stat. 207.200, the Nevada Supreme Court likely would not alter the common law to adopt this divisive and impeached modification.

On shear weight plaintiff wins this argument (nine cases to three), but, of course, that method has little basis in reason. Rather, this issue of first impression in Nevada should be on the weight of the rationale and law behind the competing concepts which falls squarely with not allowing public amusements to arbitrarily exclude patrons. Nevertheless, defendants' lead case of *Brooks v. Chicago Downs Assoc.*, 791 F.2d 512, n. 1 (7th Cir. 1986) seems to largely rely on the number of cases theory. Two other perspectives are pertinent in *Brooks'* analysis: 1) That the historic common law was different, and 2) That the change is a result in the "rise" of an "American" form of the common law. So the question is squarely posed: Is the common law in Nevada the law, or the law under a modern trend impelled by a desire to discriminate?

What is most telling is *Brooks*' rationale for dispelling the 'Jim Crow' argument. The court reasoned that the 'Jim Crow' overlay was no longer relevant "because the legislature has justly limited the absolute right to exclude to cases not involving exclusion based on race, creed, color, national origin, or sex." *Id.,* at 519, n.1.[9] This turns the relevant analysis on its head. If the practice that fomented the change in the common law (racism) is terminated, the rationale for

---

recognizes the duty of a place of public entertainment open to the general public to provide access to qualified patrons.

[9] As further indicia of the common law providing access to public amusements, and the law changing only to foster discrimination, the court is also directed to a Tennessee law of 1875, providing: "The rule of the **common law** giving a right of action to any person excluded from any hotel or public means of transportation, or place of **amusement**, is hereby abrogated . . . . . (Emphasis added). Act of Mar. 24, 1875, ch. 130, 1, 1875 Tenn. Pub. Acts 216-17. The Tennessee legislature recognized the common law of access to amusements, and statutorily abrogated it to forward discrimination through the passage of 'Jim Crow' legislation.

the change in the common law ceases to exist.[10]  Further, the true despicability of the original

rationale taints the departure from it regardless of whether the legislature has removed the

offending practice.  Still, in Nevada, no reversion is needed because its courts have never

changed the original common law, and the inability of an amusement to exclude continues.[11]

Still, another case bearing on the issue is *In re Cox*, 474 P.2d 992 (Cal. 1970).  In *Cox*,

the court was addressed the ejection of an individual from a shopping center under an ordinance

that was nearly identical to Nev. Rev. Stat. 207.200.  A State statute parroted the common law

rule that an "amusement" business open to the public could not exclude individuals.  *Id.* at 996.

The court expressly noted that this statute presented a codification of the "common law."  Thus,

in addition to the foregoing authority, in *Cox* the California Supreme Court recognized that the

common law prohibited ejection from a public amusement absent a legitimate reason.[12]

It boils down to a split of authority posing the question of whether Nevada would follow

the historic common law at the time of its formation, extant at the time the Union came into

being, and remaining extant in a number of jurisdictions?  The alternative is to accept a later

trend based in the desirability of fostering racial discrimination, serving no real public purpose,

and validating the original tawdry purpose (racial discrimination) which has been abrogated by

---

[10] The *Brooks* court also quoted authority noting that there was no contrary historic authority save for the *Uston* case.  *Brooks*, at 518.  This is an acknowledgement by the court that if they had competing authority they may well have looked differently at the issue.  Here this court is presented with the authority from nine different jurisdictions contradicting a claim of no competing authority.  *See supra* at pp. 15-16.  The *Brooks* analysis is flawed.

[11] Curiously, had the Seventh Circuit had the same case before them at an earlier date, the disposition would be opposite because Illinois required that "all persons" be granted access to public amusements.  *See Baylies v. Curry*, 21 N.E. 595, 596 (Ill. 1889).  In an ironic twist, the Illinois' addition of language to statutes prohibiting denial of access "on the basis of unlawful discrimination" is the central factor allowing the court in *Brooks* to grant the ability to exclude. *Accord and compare*  Ill. Laws, 1885, p. 64, § 1, and 775 Ill. Com. Stat. 5/5-102 (2007).

[12]  The court discussed proper ejection under the law, stating, "A business establishment may, of course, promulgate reasonable deportment regulations that are rationally related to the services performed and the facilities provided."  *In re Cox*, 474 P.2d 992, 999 (Cal. 1970).

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144 90 S. Ct. 1598 (1970), *Heart of Atlanta Motel v. United States*, 379 U.S. 241 85 S. Ct. 348 (1964), and Nev. Rev. Stat. 651.070.

Defendants' policy rationale for the latter is that a business owner should have the right to put someone out of their premises if they look like a mobster.  The converse policies are more reasoned..  As a general proposition,

> "[P]roperty owners open . . . to the general public . . . have a duty not to act in an arbitrary or discriminatory manner toward persons . . . [because] . . . [p]roperty owners have no legitimate interest in unreasonably excluding particular members of the public when they open their premises for public use."

*Uston*, *supra* at 375.  Then there's the concept of fairness.  A person that is throwing their money at a proprietor in exchange for the amenities offered should not be able to arbitrarily discriminate against that person.  *See* "*Note:  Patron's Right of Access to Premises Generally Open to the Public*," 1983 U. Ill. L. Rev. 533, 546-47 (1983), (The ability to exclude for no reason, "often yields unfair results . . . .  In granting this unlimited power, the court totally disregards both the reasonableness of the  owner's actions and the position of the excluded patron.").

As an overlay, there's the fact that casinos are a restricted trade operating under a privilege license at variance with the common law.  They would not and could not exist but for a special grant of authority from the state.  Commentators note that the right of the public access under the common law originates in the special license granted by the crown.  It is antithetical to reason that the state grant this special privilege and then allow the oligopolic franchisee to limit access rather than requiring that "all who apply shall be served . . . without discrimination."  *See* "*The Law of Public Callings as a Solution of the Trust Problem*," 17 Harv.L.Rev. 156, 166, Bruce Wyman (1904), and "*The Origin and First Test of Public Callings*," 75 U.Pa.L.Rev. 411, 423 (1927).  Reason dictates that the State avoid arbitrary discrimination against any citizen, and in acquiring their special privilege,  gaming licensees should live by the same policy and reason.

Also pertinent is the policy effect of a decision that allows a casino to exclude advantage players or arbitrarily exclude patrons.  Nevada's public policy on gaming provides in part:

> Nev. Rev. Stat. 463.0129.1 . . .
>     (b) The continued growth and success of gaming is dependent upon **public confidence and trust** that licensed gaming . . . [is] conducted honestly and **competitively**, . . . * * *
>      (e) To ensure that gaming is conducted . . . **competitively** . . . all gaming establishments in this state must remain open to the general public and the access of the general public to gaming activities must not be restricted in any manner except as provided by the Legislature.

(Emphasis added).  In stating, "competitively," Nevada adds a concept not found in other gaming jurisdictions, and it is Nevada policy that the patron can compete with the casino in the games. Concepts like 'winning too much' as a basis for ejection run counter to this policy.

The touchstone of gaming policy is "public confidence and trust."  But, "[t]he exclusion of persons who can play the licensed games to their advantage may diminish public confidence in the fairness of casino gaming."  *Uston v. Resorts International Hotel, Inc.*, 445 A.2d 370, 376 (N.J. 1982).  This truism actually falls short of the detrimental affect that allowing the exclusion of winning gamblers would have on the public trust and confidence in Nevada gaming.  There is no trust or confidence in the industry if prospective patrons are told that they will be thrown out if they have the good fortune to actually win.  The natural extension of such a practice results in the savvy consumer asking, Why go?, and then staying home (or worse, saying, 'Let's go to Atlantic City, you can't win in Nevada').

## V.  DEFENDANTS' INTERPOSITION OF A SLEW OF IRRELLEVANT CASES, STATUTES, AND REGULATIONS HAS NO AFFECT ON THE EFFICACY OF THE FOREGOING ANALYSIS

At defendants' brief, pp. 19-23, defendants attempt to argue that other legal authorities apply to the current circumstance.  Review of this other authority shows that it has no application whatsoever.  For example, defendants argue that *Spilotro v. State*, 661 P.2d 467 (Nev. 1983)

somehow relates to the current circumstance.  It does not.  It related to a notorious person being placed in Nevada's infamous "Black Book."  Still, the court ruled that the Gaming Commission had to articulate a legitimate reason for excluding Mr. Spilatro.  Thus, the court noted that a good reason for exclusion was required.  The case did not involve the common law either.  The case simply has no application, and to the extent it might, a legitimate reason to exclude was needed.  Advantage play is not a legitimate reason.  *Uston* at 375.  Under *Spilatro* plaintiff wins.[13]

Defendants' citation to *Lyons v. State*, 775 P.2d 219, 222 (Nev. 1989) is likewise ineffectual.  Defendants cite to a statement that the casino may take measures to deny Lyons access to the games.  As mentioned above, this case arises two years before enactment of Nev. Rev. Stat. 463.0129(e), which provides that access to the games cannot be restricted.  The provision cited by the defendants was addressed and overruled by the legislature.  Further, the discussion of an ability to refuse play in *Lyons* does not reach the issue here, to wit:  The ability to refuse or cancel admission without reason.  Clearly, *Lyons* has no application.

In their final flourish, defendants argue that gaming regulations and tort liability give the defendant the right to exclude or eject.  The most that can be said of defendants' analysis is that if they have a legitimate basis for believing that a patron is a notorious criminal or affiliated with criminal elements, or presents a danger to other patrons, then they may have a legitimate basis for exclusion or ejection.  It by no means reaches the issue before the court concerning whether an arbitrary right to exclude or eject exists.  Defendants' argument does not apply.

---

[13] The law the court addressed in *Spilatro* was constitutional access.  Plaintiff addresses common law access.  *Spilatro* does not come within a country mile of the issue before the court.

## VI. CONCLUSION

Defendants request that the court recognize a common law principle never before recognized in Nevada, created for the purpose of fostering racial discrimination, contrary to numerous other jurisdictions, at variance with the historic common law, which is contrary to reason, and which runs afoul of stated policy goals permeating Nevada gaming.  Considering the sound reasons, historical perspective, and contrary authority, there is no reason to believe that the Nevada Supreme Court would declare that the "common law" in Nevada follows any rule other than the historic common law perspective that the purveyor of a public amusement cannot arbitrarily exclude or eject a patron.  Plaintiff requests partial summary judgment determining that defendants could not arbitrarily eject plaintiff, eject plaintiff for winning, or eject plaintiff because he was associated with, or was himself, a legal advantage gambler.

Dated this 1st day of August, 2008.

NERSESIAN & SANKIEWICZ

_____/S/_____
Robert A. Nersesian, Esq.
Nevada Bar No. 2762
528 South 8TH Street, Suite A
Las Vegas, Nevada 89101
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

On this 5th day of August, 2008, the undersigned did serve a copy of the foregoing reply upon the following attorney through the CMECF system maintained by this court.

M. Craig Murdy, Esq.
Ste. 155
7881 West Charleston Blvd.
Las Vegas, NV  89117

_____/S/_____
Robert A. Nersesian